## James T. Patten, Defendant in Error, v. John N. Faithorn, as Receiver, Plaintiff in Error.

### Gen. No. 14,860.

1. APPELLATE COURT—*what without jurisdiction to review.* The Appellate Court has no jurisdiction to determine the validity of an act of the legislature.

2. NEGLIGENCE—*when safety appliances act applies.* *Held,* under the evidence, that the safety appliances act of Illinois requiring the use of automatic couplers was applicable in this case, and that if the locomotive and tender in question were used in interstate commerce the burden was upon the defendant to establish such fact.

3. MASTER AND SERVANT—*when doctrine of assumed risk does not*

*apply.* In an action predicated upon the failure of a master to employ automatic couplers as provided by the safety appliances act, the doctrine of assumed risk does not apply.

4. MASTER AND SERVANT—*who not fellow-servants, as a matter of law.* *Held,* that a switchman and an engineer were not fellow-servants as a matter of law.

5. NEW TRIAL—*when newly discovered evidence not ground for.* Newly discovered evidence which tends to contradict answers given by a party upon cross-examination is not ground for a new trial where such answers were with respect to a collateral matter as to which he could not be contradicted.

Action in case for personal injuries. Error to the Superior Court of Cook county; the Hon. BEN. M. SMITH, Judge, presiding. Heard in this court at the October term, 1908. Affirmed. Opinion filed January 24, 1910.

JESSE B. BARTON, for plaintiff in error.

JAMES C. McSHANE, for defendant in error.

MR. JUSTICE BAKER delivered the opinion of the court.

This is an action on the case by defendant in error against plaintiff in error to recover for injuries sustained by plaintiff while in the service of defendant as a switchman. There was a trial by jury and judgment for the plaintiff for $12,500, to reverse which the defendant prosecutes this writ of error.

Plaintiff was injured in the Robey street yard of the defendant in Chicago. He belonged to a switching crew, of which Pease was foreman. Canty was the foreman of another switching crew working in the same yard. A train of freight cars under Canty's charge was on a track called the west main, east of a certain switch, and the locomotive was at the west end of the train. Canty, by direction of the yardmaster, cut off the four cars next to the locomotive and proceeded with them west on said west main track some distance west of said switch, and stopped. A switch track led from the south and west into said west main track at said switch. The yardmaster ordered Pease

to take three freight cars on said switch track on to said west main track at said switch, go east far enough to clear the switch, and then reverse, uncouple said three cars from the locomotive, and "put them on to Canty." The purpose of said orders was to place said three cars on said west main track west of the switch, so that Canty, after Pease's locomotive had gone back on to the switch track, might couple on to said cars and take them east beyond the switch and couple on to the cars which he had left on said track. Pease's locomotive was at the east end of the train. Pursuant to the orders of the yardmaster he took his train onto said west main track and proceeded east far enough to clear the switch, and the switch was thrown so as to make the rails of the west main track continuous. Pease and the plaintiff stood alongside said track some distance east of the switch. Pease gave the back up signal to his engineer and told the plaintiff to get on when the engine came back to them, and cut off said three cars. The coupler on the tender of the locomotive and the coupler on the car to which it was coupled were defective, and neither could be operated by the lever or handle. To uncouple the car from the tender plaintiff was compelled to go between the tender and the car, lift the pin and hold it up with his hand. Plaintiff went on the footboard of the tender and reached over to lift the pin with his hand. Just then Canty's train came back east and collided with Pease's train. In the collision the drawbar of the tender was broken and plaintiff was caught between the tender and the car and injured. It is conceded that Canty's locomotive should have stood still until Pease's engine had been uncoupled from the cars and gone on to the switch track, and that it moved east under some mistake of Canty's engineer.

The first count of the declaration alleges that the receiver while engaged as a common carrier was moving traffic upon the railroad between points in the state of Illinois and was operating upon and in connection

with said railroad certain locomotive engines and cars and negligently and unlawfully, and contrary to the statute in such case made and provided, hauled and used upon said railroad in moving said state traffic, a certain switch engine equipped with a certain coupler in a defective and inoperative condition, so that it could not be uncoupled from the side of the engine without the necessity of switchmen going between the ends of the engine and the car to which it was coupled, and that as a direct result and in consequence of the defective and inoperative condition of said coupler and coupling appliance connected therewith, the plaintiff was unable to uncouple said engine from the side of the engine and was required to and did go between the ends of the engine and the car to which it was coupled for the purpose of uncoupling the same, and while he was so between the ends of the engine and car and in the exercise of ordinary care, other cars on the same track collided with the cars to which plaintiff's engine was coupled, and the drawbar or coupler was broken, and the engine and car between which plaintiff was were jammed against each other and injured the plaintiff. The plea was not guilty.

The Act referred to in said count is the Act known as the Safety Appliance Act, approved May 12, in force July 1, 1905, Hurd's Stat. ed. 1908, 1709. Section 2 of said Act provides: ''That from and after the passage of this Act it shall be unlawful for any such common carrier to haul or permit to be hauled or used on its line any locomotive, tender, car or similar vehicle used in moving state traffic not equipped with couplers, coupling automatically by impact, and which cannot be uncoupled without the necessity of men going between the ends of the cars.'' Section 6 imposes a penalty for a violation of the Act and concludes as follows: ''Provided that nothing in this Act contained shall apply to * * * trains, locomotives, tenders, cars and similar vehicles used in interstate commerce.'' Section 7 provides that the Act shall apply to common carriers en-

gaged in moving traffic by railroad between points in this state, "and shall be held to apply to all trains, locomotives, tenders, cars and similar vehicles engaged in moving traffic between points in the state of Illinois, excepting    *    *    *    all those trains, locomotives, tenders, cars and similar vehicles used in interstate commerce." Section 9 is as follows: "That any employe of any such common carrier who may be injured by any train, locomotive, tender, car or similar vehicle in use contrary to the provisions of this Act, shall not be deemed to have assumed the risks thereby occasioned, nor to have been guilty of contributory negligence because of continuing in the employment of such common carrier or in the performance of his duties as such employe after the unlawful use of such train, locomotive, tender, car or similar vehicle had been brought to his knowledge."

In the brief for plaintiff in error it is said that "the questions which arise under this count and the evidence are: First: Is the statute of Illinois referred to in this count valid? Second: If valid, is it applicable to this case under the evidence? Third: If valid, does it abolish the defense of assumed risk?" The question of the validity of the Act is a question which this court, under the provisions of the constitution and the statute, is not authorized to consider.

It appears from the evidence that Pease's locomotive and tender were used only in switching in Illinois. The immediate work in which they were employed when plaintiff was injured was the moving of three freight cars from one place to another in the yard of defendant in Chicago. The service being wholly within the state, the traffic was presumably "state traffic," and the burden was on the defendant to show that it was "interstate commerce." There is in the record no evidence tending to show that the moving of said cars, or any one of them, was a part of a continuous interstate carriage or transportation, or that it was "interstate commerce." From the evidence the

jury might properly find that at the time of plaintiff's injury Pease's locomotive and tender were engaged "in moving state traffic." It follows from what has been said that in our opinion the Safety Appliance Act of this state is, under the evidence, applicable to this case.

The ninth section of the Act expressly eliminates the defense of assumed risk in case an employe is injured by any locomotive, tender, etc., "in use contrary to the provisions of the Act." The question of the validity of such provision is not open in this court. The tender was not equipped as required by the Act. We think that under the evidence the defendant was properly found guilty under the first count.

The second count is substantially like the first, except that it alleges that the coupler on the car to which the tender was coupled was in such a defective condition that the tender and car could not be uncoupled without going between the tender and the car. The evidence supports the allegations of the count. Plaintiff made no attempt to use the uncoupling appliance on the car, and its defective condition is only important because, if not defective, plaintiff might have uncoupled the car from the tender without going between them. It was because the coupling appliance on the car and that on the tender were both defective, that plaintiff was compelled to go between the car and tender to uncouple, and hence the defective condition of the coupling appliance on the car contributed to plaintiff's injury. We do not think that evidence that the cars bore the marks, "R. G. & W. 1750" was evidence tending to show that the car, at the time of the accident, was "used in interstate commerce."

The negligence alleged in the third count is, that the "drawbar was broken, weak and otherwise so defective that it was liable and likely to break while in use; that in the collision the drawbar, because of said condition, broke and thereby plaintiff was injured." From the evidence the jury might properly find that an inspec-

tion of the broken drawbar immediately after the accident showed that there was an old crack in the top and side of the drawbar, which was rusty, while the remainder of the broken surfaces were bright and fresh. It was the breaking of the drawbar that permitted the ends of the car and tender to come so near to each other as to injure the plaintiff. We think that the questions whether the defendant was guilty of negligence in respect to the drawbar, and, if negligent, whether such negligence contributed to plaintiff's injury, and whether the plaintiff knew, or, if he had exercised ordinary care would have known, of the defective condition of the drawbar, and therefore be held to have assumed the risk, were, on the evidence in the record, questions of fact for the jury, on which their verdict must be held conclusive.

The negligence alleged in the fourth and fifth counts, is the negligence of Canty's engineer in starting and running his train east on the west main track without signal or warning. Plaintiff in error does not question the negligence of Canty's engineer in so starting and running his train, but contends that plaintiff and said engineer were fellow-servants. It is not claimed that they were fellow-servants on the ground that their usual duties brought them into habitual association, so that they might exercise an influence on each other promotive of proper caution, but that they were fellow-servants because they were directly co-operating with each other in the work in hand at the time of the accident. The order of the yardmaster to Pease, to put the three cars, ''on to Canty,'' did not mean that Pease was to shove said cars west until the front car reached the east end of Canty's train, or that Pease or any one of his crew was to couple said cars to Canty's train, but only meant that Pease was to put said cars on to the west main track east of Canty's train, so that Canty might couple said cars to his train. Canty's train was far enough west of the switch so that if it had remained standing, the three cars when cut off

would have stopped, leaving a space of several car lengths between the east end of Canty's train and the west end of Pease's train. Pease did not intend that any one of his crew should make the coupling between his train and Canty's, and had no man on the end of the car next to Canty to make such coupling. If the work had been done in the manner intended, plaintiff would have uncoupled the three cars, and with that act his duties and the duties of his crew in respect to those cars would have ceased before Canty's duties in respect to them began. It was not intended that Pease should have anything to do with the three cars after they were cut loose from his engine, or that Canty should have anything to do with said cars until after they had been cut loose from Pease's engine and gone west beyond the switch and Pease's engineer had gone from the west main track at the switch on to the side track. In Hartley v. C. & A. R. R., 197 Ill. 440, and in Pa. Co. v. Chapman, 220 *id.* 428, s. c. 118 Ill. App. 201, one switching crew placed cars on a track to be taken away by another crew, and the plaintiff, a member of one crew, was injured through the negligence of a member of the other crew. In each case it was held that the question whether the plaintiff and the member of the other crew, through whose negligence he was injured, were or were not fellow-servants, was a question of fact for the jury. We think that under the evidence in this case, the question whether plaintiff and Canty's engineer were or were not fellow-servants, was a question for the jury, on which their verdict must be held conclusive.

Plaintiff, on cross-examination, was asked about a proceeding in which his wife was granted a divorce from him some time prior to his injury. In support of a motion for a new trial on the ground of newly discovered evidence, defendant presented an affidavit and the record of said proceedings for divorce which, it is claimed, show that plaintiff's answers, on cross-examination, as to the ground on which his wife obtained a

divorce were not true; that he testified that his wife obtained a divorce on the ground of desertion, whereas the truth was that the divorce was granted to her on the ground that he was guilty of adultery. The defendant saw fit to interrogate the plaintiff, on cross-examination, as to a matter not material to the issue, and on the trial would not have been permitted to contradict plaintiff's testimony as to such immaterial matter. The motion for a new trial on the ground of newly discovered evidence was properly denied.

Finding no error in the record, the judgment of the Superior Court will be affirmed.

*Affirmed.*